IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Jennifer Gilliam, | ) | Civil Action No. 3:03-3370-17BC |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| South Carolina Department of Juvenile Justice, | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Plaintiff, Jennifer Gilliam ("Gilliam"), filed this action alleging discrimination by her former employer, the South Carolina Department of Juvenile Justice ("SCDJJ"). She alleges disparate treatment based on race and a racially hostile work environment pursuant to Title VII.[1] By order filed January 16, 2004, Gilliam's claims under the Americans With Disabilities Act were dismissed.[2] SCDJJ filed a motion for summary judgment on November 5, 2004. Gilliam filed an opposition memorandum on December 13, 2004 ("Pl. Mem."). SCDJJ filed its reply on December 20, 2004.

SCDJJ's motion for summary judgment addressed Gilliam's disparate treatment claim as an allegation of disparate treatment in discipline based on race. Gilliam did not respond to SCDJJ's arguments in her opposition memorandum, but instead asserted that she had been constructively discharged because of her race. SCDJJ filed a reply memorandum in which it argued that Gilliam did not allege constructive discharge in her complaint, nor did she exhaust

---

[1]This case was automatically referred to the undersigned for pretrial purposes pursuant to Local Rule 73.02(B)(2)(g).

[2]Gilliam's claim for punitive damages was likewise dismissed.

such a claim through the administrative process. During a telephone conference on April 4, 2005, counsel for Gilliam stated that her only disparate treatment claim was for constructive discharge. By order filed April 5, 2005, Gilliam was given the opportunity to respond to SCDJJ's arguments on that claim. Gilliam filed a second memorandum on April 15, 2005 ("Pl. Mem. #2"). However, in that memorandum, Gilliam only reiterates her arguments concerning her hostile work environment claim and does not mention her constructive discharge claim. She concludes only that "Defendant's motion for summary judgment should be denied as to Plaintiff's Hostile Work Environment" claim. (Pl. Mem. #2, p. 6). Thus, Gilliam appears to conceded that SCDJJ is entitled to summary judgment on her constructive discharge claim.

### Standard of Review

When no genuine issue of any material fact exists, summary judgment is appropriate. Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991). The facts and inferences to be drawn from the evidence must be viewed in the light most favorable to the non-moving party. Id. Courts take special care when considering summary judgment in employment discrimination cases because states of mind and motives are often crucial issues. Ballinger v. North Carolina Agric. Extension Serv., 815 F.2d 1001, 1005 (4th Cir.), cert. denied, 484 U.S. 897 (1987). This does not mean that summary judgment is never appropriate in these cases. To the contrary, "'the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.'" Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). "Genuineness means that the evidence must create fair doubt; wholly speculative assertions will not suffice." Ross v. Communications Satellite Corp., 759 F.2d 355, 364 (4th Cir. 1985).

In this case, defendant "bears the initial burden of pointing to the absence of a genuine issue of material fact." Temkin v. Frederick County Comm'rs, 945 F.2d 716, 718 (4th Cir. 1991) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). If defendant carries this burden, "the burden then shifts to the non-moving party to come forward with facts sufficient to create a triable issue of fact." Id. at 718-19 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

Moreover, "once the moving party has met his burden, the nonmoving party must come forward with some evidence beyond the mere allegations contained in the pleadings to show there is a genuine issue for trial." Baber v. Hosp. Corp. of Am., 977 F.2d 872, 874-75 (4th Cir. 1992). The non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. Id. and Doyle v. Sentry Inc., 877 F. Supp. 1002, 1005 (E.D.Va. 1995). Rather, the non-moving party is required to submit evidence of specific facts by way of affidavits [see Fed. R. Civ. P. 56(e)], depositions, interrogatories, or admissions to demonstrate the existence of a genuine and material factual issue for trial. Baber, citing Celotex Corp., supra. Moreover, the non-movant's proof must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." Mitchell v. Data General Corporation, 12 F.3d 1310, 1316 (4th Cir. 1993) and DeLeon v. St. Joseph Hospital, Inc., 871 F.2d 1229, 1233 (4th Cir. 1989), n.7. Unsupported hearsay evidence is insufficient to overcome a motion for summary judgment. Martin v. John W. Stone Oil Distrib., Inc., 819 F.2d 547 (5th Cir. 1987) and Evans v. Technologies Applications & Services Co., 875 F. Supp. 1115 (D.Md. 1995).

**Facts**

1. Gilliam is African-American.

2. On April 21, 1995, Gilliam was hired as a Staff Nurse by SCDJJ. (Pl. Dep. 26-27).

3. Her supervisor was Dr. Sandra Carnesale ("Carnesale"). (Pl. Dep. 28).

4. On September 29, 1995, Carnesale issued Gilliam a written reprimand for violation of SCDJJ policy. In that reprimand Carnesale noted:

    > You consistently fail to carry out your duties, and at best, the quality of your work is marginal. You do not monitor the juveniles taking their medication, increasing the possibility of juveniles hoarding medication. Your sick call slips are not thorough… (Pl. Dep. Ex. 11).

5. In March of 1998, Gilliam was promoted to Campus Nurse at SCDJJ's Willow Lane Campus (Pl. Dep, 27, 31).

6. At Willow Lane, George M. Bader ("Bader") became Gilliam's supervisor (Bader Aff., Pl. Dep. 28), i.e., her Nurse Manager.

7. On September 14, 1998, Lawrence J. Eberlin ("Eberlin"), SCDJJ's Chief of Nursing, issued a memorandum reminding the employees he supervised of SCDJJ's written attendance and work hours. The memorandum stated that the day shift (which Gilliam worked) ran from 7:00 a.m. until 3:00 p.m. The memorandum also stated:

    > Any deviation from these hours must be approved by the appropriate Nurse Manager…Any nurse who is going to be **late** for **any** reason must call the Nurse Manager on call and let him/her know. Lateness cannot be made up for staying over at the end of the shift without prior approval of the appropriate Nurse Manager (emphasis in original). (Pl. Dep., Ex. 13).

8. On October 29, 1998, Bader wrote Gilliam a memorandum concerning her work hours and leave. The memorandum noted that her work schedule had been altered so that she could work from 7:30 a.m. to 4:00 p.m. and that she must present a leave slip for deviations from the schedule in accord with SCDJJ policy. The memorandum summarized the hours Gilliam had missed in August (8 hours), September (21.75 hours) and October (15.75 hours) of 1998 and required her to turn in leave slips for hours missed. (Pl. Dep., Ex. 14).

9. Bader met with Gilliam and gave her an oral warning on October 30, 1998, for being tardy, leaving work early, and failure to turn in leave slips. In a response, Gilliam wrote that her tardiness was due to the fact that she could not take her child to school before 7:30 a.m. She stated she made up the time the same as other employees. (Pl. Dep., Ex. 15).

10. Bader met with Gilliam again on November 13, 1998, to discuss the work schedule issues. He wrote her a memorandum on November 24, 1998, reiterating her problems, advising that she had failed to turn in the leave slips required by his previous memorandum, suggesting a different position which might accommodate her schedule, and asking her to respond in writing by December 4, 1998. Bader attached leave slips for Gilliam's signature to cover absences from August 21, 1997 through November 24, 1998. (Pl. Dep., Ex. 16). Gilliam did not sign the leave slips or respond.

11. On December 17, 1998, Bader wrote Gilliam a memorandum referenced "Notice of Management Concern" dealing with the same subject. Bader informed Gilliam

that because she had refused to sign the leave slips, they had been processed without her signature. Bader demanded a written response from Gilliam for her "immediate and final resolution of the problem by 8:00 a.m. December 19, 1998." (Pl. Dep., Ex. 18).

12. Bader issued Gilliam a written reprimand based on the failure to respond to his memoranda. Gilliam received the written reprimand on December 21, 1998, and expressed her disagreement. She stated:

> Issue (1) December fourth I was out with the pink eye for the entire week. Issue (2) I'm still obligated to get my child to school at 7:25 AM. Issue (3) The leave forms submitted did not show that I had been getting a 30 minute lunch due to the fact I was arriving later, and that's the reason I did not sign them. Any other times submitted are incorrect. (Pl. Dep., Ex. 19).

13. On December 21, 1998, Gilliam also wrote to Bader that her scheduling problem would be resolved after January 8, 1999, as her child was transferring to a different school and she would be able to arrive at work by 7:30 a.m. (Pl. Mem., Ex. 20).[3]

14. Bader performed an inspection on June 9, 1999. He wrote Gilliam a memorandum on June 16, 1999, noting numerous problems with Gilliam's medication sheets (i.e., documentation of medication delivered by Gilliam to the juveniles) and other errors with respect to documentation. (Pl. Dep., Ex. 22).

15. On June 28, 1999, Bader counseled Gilliam and wrote her a memorandum due to her failure to follow policy requiring that narcotic drugs be signed out. (Pl. Dep., Ex. 23).

---

[3]The issue appears to have been generally resolved as Gilliam was not reprimanded for this reason after December of 1998.

16. Bader again inspected the facility on October 31, 1999. He wrote Gilliam a memorandum on November 8, 1999, detailing numerous deficiencies. In that memorandum, Bader stated that Gilliam's position as Campus Nurse was "important" and "relatively independent in nature." He indicated that Gilliam should be able to manage her position with little supervision but that because of the problems he would be monitoring compliance. (Pl. Dep., Ex. 24).

17. On or about November 23, 1999, Bader issued Gilliam a written reprimand for refusal to carry out the oral instructions and written directives he had given. This involved failure to correct deficiencies from the inspection of October 31, 1999. Gilliam wrote that she disagreed with the reprimand (Pl. Mem., Ex. 25).

18. On January 19, 2001, Bader had a conversation with Gilliam criticizing her failure to properly stock and organize medications at Willow Lane. Bader followed up with a written memorandum on January 23, 2001. (Pl. Dep., Ex. 26).

19. Gilliam responded by a memorandum to Bader dated January 25, 2001. She stated that she felt the conversation concerning her duty to stock and organize medications was "a forum for [her] to be frequently **Questioned**, **Threatened**, **Criticized** and **Humiliated** in front of my co-workers, as well as a **Stage** for possible disciplinary action(s)." (Emphasis in original). (Pl. Mem., Ex. 27).

20. The next day, January 26, 2001, Bader wrote Gilliam a memorandum which stated:

> This letter is notification that you will continue in Willow Lane nurse duties until February 2, 2001. On February 5, 2001, you will be assigned new duties within Health Services. Your assignment will be listed on the assignment board. (Pl. Dep., Ex. 28).

7

21. Bader went to Gilliam's office to obtain her signature for receipt of the letter and a confrontation ensued. Gilliam read the letter and expressed her disagreement. When she attempted to leave the office to make a copy of the letter for her attorney, Bader blocked the door. She was able to get around Bader, but he grabbed her elbow. After the copy was made, Bader took the letter, unsigned, from Gilliam. (Def. Dep., Exs. 28 and 30).

22. Gilliam wrote a letter to Earl Pruitt, SCDJJ's Human Resource Manager describing the incident.[4] Gilliam stated that Bader had used a "demanding tone" and that he had been "very angry and unprofessional and hostile in fact." (Pl. Dep., Ex. 30).

23. Gilliam had a "breakdown" in May of 2001. She sought help from the South Carolina Vocational Rehabilitation Department ("Voc. Rehab.") on May 17, 2001. She reported depression, anxiety and elevated blood pressure. On May 24, 2001, Voc. Rehab. referred her to Baptist Hospital "for partial hospitalization for one week with evaluation for meds and continued therapy." (Pl. Dep. 19, Pl. Mem., Ex. D, Unekis Dep. 8-10).

24. Gilliam was out of work for approximately three weeks. (Pl. Dep. 19-20).

25. On August 29, 2001, the South Carolina Department of Health and Environmental Control ("DHEC") performed an inspection at Willow Lane and found two violations of administration of narcotics by Gilliam. Bader gave Gilliam a written reprimand based on DHEC's findings. In reply, Gilliam wrote that she had been

---

[4]This letter is undated, but refers to a conversation between Gilliam and Pruitt on February 7, 2001.

distracted by the juvenile and that the violations were "an error which I accept responsibility of and in the future will make the upmost (sic) effort to make sure that this will never be a repeated occurrence." (Pl. Dep., Ex. 33).

26. Also on August 29, 2001, Gilliam left work early without prior approval of her supervisor in violation of SCDJJ policy. A written reprimand was issued. In her written response, Gilliam stated that she attempted to notify Larry Eberlin, SCDJJ's Director of Nursing, that she had to leave work for an "appointment" but he was unavailable. Instead, she told Frazier Jackson that she was leaving. (Pl. Mem., Ex. 34). Apparently, Jackson was not a proper person to notify under the policy.

27. Gilliam suffered a second "breakdown" on August 29, 2001, and was again hospitalized. (Pl. Dep. 109).

28. Gilliam never returned to work after August 29, 2001. However, she remained on leave until February 25, 2002, when she was administratively terminated. (Pl. Dep. 20, Pl. Dep., Exs. 8-9).

29. Gilliam filed an administrative charge of discrimination with the EEOC and SHAC on January 15, 2002. She marked the boxes for discrimination based on race, disability and Fepa. She stated the last discrimination took place on or about August 26, 2001. With regard to her claims, she stated:

> I. PERSONAL HARM. Continuing through on or about August 21, 2001, I was subjected to a hostile work environment in that I was held to stricter standards than similarly situated white co-workers.
>
> II. RESPONDENT'S REASONS FOR THE ADVERSE ACTION. I was given no reason.

9

> III. COMPLAINANT'S CONTENTIONS. I received disciplinary action for rules infractions that white co-worker were not disciplined for committing. I was threatened with demotion and received performance evaluations of sub-standard performance on job duties that white co-workers were also responsible for but were not rated on. Because of my work environment, I was placed on medical leave on or about August 26, 2001. I contend that I was systematically singled out for harsher treatment because I am the only black full-time nurse at the facility.
>
> IV. DISCRIMINATION STATEMENT. I therefore believe that I was discriminated against because of my race (black) in violation of the South Carolina Human Affairs Law, as amended, the Americans With Disabilities Act of 1990, as amended, and Title VII of the United States Civil Rights Act of 1964, as amended.

(Pl. Dep., Ex. 3).

30. A right-to-sue letter was issued on February 21, 2003 (Pl. Dep., Ex. 4).

## Discussion

A. Constructive Discharge

1. Exhaustion

Constructive discharge constitutes a discrete discriminatory act actionable under Title VII which requires administrative exhaustion. Young v. National Ctr. for Health Serv. Research, 828 F.2d 235, 237-38 (4th Cir. 1987) and Malghan v. Evans, 2004 WL 2980753 (4th Cir. 2004) (unpublished).

Generally speaking, this court does not have subject matter jurisdiction under Title VII of claims omitted from the EEOC administrative charge. Dennis v. County of Fairfax, 55 F.3d 151, 156-57 (4th Cir. 1995). However, an employee's claims in this court are not strictly limited by the allegations of the EEOC charge, but rather by the scope of the EEOC investigation which can reasonably be expected to result from the charge of discrimination. King v. Seaboard Coast Line

10

Railroad Co., 538 F.2d 581, 583 (4th Cir. 1976); EEOC v. General Electric Co., 532 F.2d 359, 362 (4th Cir. 1976). In other words, a claim omitted from the administrative charge can be maintained in a Title VII complaint only where the claim is "reasonably related to the allegations and claims in the administrative charge or, if disclosed, the omitted claim could reasonably be expected to follow from the administrative investigation based on the deficient administrative charge." Nicol v. Imagematrix, Inc., 767 F. Supp. 744, 753 (E.D.Va. 1991). In Nicol, Judge Ellis engaged in a thorough discussion of this issue and concluded that the factual allegations contained in the narrative of the administrative charge must be analyzed to determine whether a judicial claim is within the scope of the administrative charge of discrimination. He suggested a more bright line test implied by some courts, "(w)here…the EEOC charge alleges a particular category of discrimination…, allegations of different types of discrimination will be considered per se not reasonably related unless the new allegations are either implicit in the EEOC charge or could be inferred from the facts alleged in the charge." Id. n11.

At the time Gilliam filed her charge of discrimination, she was on medical leave. No constructive discharge had taken place at that time. The record does not show that Gilliam attempted to amend her charge to allege constructive discharge or that a constructive discharge was investigated by the agency.

    2.    Pleading

As indicated above, Gilliam's claim for disparate treatment is undefined. She alleges only that "she was treated differently than Caucasian employees who were similarly situated." (Complaint ¶ 20). In the factual recitation in the complaint, Gilliam alleges that she "was placed on medical leave and retired on disability on August 28, 2001." (Complaint, ¶ 15).

A plaintiff must allege "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  The purpose of the complaint is to give notice of the claim and the grounds that support it.  The complaint "must at least set forth enough details so as to provide defendant and the court with a fair idea of the basis of the complaint and the legal grounds claimed for recovery." Karpel v. Inova Health System Services, 134 F.3d 1222, 1227 (4th Cir. 1998), quoting Self Directed Placement Corp. v. Control Data Corp., 908 F.2d 462, 466 (9th Cir. 1990).  In Inova, the court upheld summary judgment because the complaint lacked details sufficient to put defendant or the court on notice that plaintiff desired to allege a specific discrimination claim.  Id.  Similarly, Gilliam's complaint lacks such details.  This conclusion is underscored by the fact that defendant initially and with reason construed plaintiff's claim as one for disparate treatment in discipline.

      B.      Hostile Work Environment

Gilliam asserts that she was subjected to a racially hostile work environment. SCDJJ argues that it is entitled to summary judgment on this claim because: (1) it is time barred; (2) Gilliam has not established a prima facie case; and (3) she has not rebutted SCDJJ's legitimate, non-discriminatory reasons for its actions.

      1.      Filing Period

A plaintiff is required to file an administrative charge of discrimination with the appropriate agency within 300 days (in this case) of the alleged discriminatory action. 42 U.S.C. § 2000e-5(e)(1).  In National Railroad Passenger Corp. v. Morgan, 536 U.S. 101 (2002), the Supreme Court discussed the application of this statute to hostile work environment claims. The Court noted that hostile work environment claims, by definition, involve a continuous course

of conduct, and held that "the employee need only file a charge within…300 days of any act that is part of the hostile work environment. <u>Id</u>. at 118. A court must "determine whether the acts about which an employee complains are part of the same actionable hostile work environment practice, and if so, whether any act falls within the statutory time period." <u>Id</u>. at 120. If plaintiff shows that the incidents are related and at least one falls within the statutory time period, the hostile work environment claim is not time barred.

SCDJJ argues that Gilliam's hostile work environment claim is time barred because she cannot show that the incidents she cites within the statutory time period[5] are not substantially related to the incidents outside that time period. Defendant cites <u>Bryan v. Lucent Technologies, Inc.</u>, 307 F.Supp.2d 726 (D.Md.) *aff'd*. 2004 WL 2476480 (4th Cir. 2004) and argues that the facts in the present case are "indistinguishable from that of the plaintiff in <u>Bryan</u>." (Def. Mem., p. 17). The undersigned disagrees.

In <u>Bryan</u>, a supervisor subjected plaintiff to a pattern of inappropriate, harassing and overtly sexual conduct. Plaintiff had no contact with the harasser after December of 1999. She was transferred by her new supervisors in April 2001, and she resigned in May 2001. The plaintiff alleged that the harassment by the first supervisor and her later transfer and resignation constituted a continuing course of sexual harassment.[6] The court disagreed because the nature of the harassment was different as were the alleged perpetrators. Gilliam alleges only racial harassment by one supervisor, Bader, during an approximately four-year period. The nature of

---

[5] These would be the incidents for which Bader gave Gilliam written reprimands in August of 2001.

[6] The transfer and resignation were the only acts alleged within the statutory filing period.

13

the harassment was generally the same, i.e., critical statements about her work accompanied by reprimands. Thus, the undersigned concludes that Gilliam's allegations concerning harassment by Bader prior to March 21, 2001, should be considered.

      2.    Prima Facie Case

To establish a prima facie case of a racially-hostile work environment, a plaintiff must that she was the target of conduct that was (1) unwelcome; (2) based on race; (3) sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and that (4) there is some basis for imposing liability on the employer. <u>Honor v. Booze-Allen Hamilton, Inc.</u>, 383 F.3d 180, 190 (4th Cir. 2004); <u>Spriggs v. Diamond Auto Glass</u>, 242 F.3d 179, 183-4 (4th Cir. 2001). SCDJJ asserts that Gilliam has not shown any of Bader's actions about which she complains were based on her race and that those actions were not sufficiently severe or pervasive to alter the terms and conditions of her employment.

      a.    Race Based Action

SCDJJ asserts that Gilliam cannot show that the actions about which she complains were based on her race. There is no allegation or evidence of overt racism such as epithets, taunting, etc. in this case. Instead, Gilliam alleges that she was harassed only by her supervisor, Bader, on a continuous basis because of her race. Gilliam notes that Bader is white and that she was the only African-American nurse at the Willow Lane Campus. She then argues that Bader treated her differently and more harshly than the white nurses. Even though the evidence in the record is limited, the undersigned concludes that in the light most favorable to Gilliam, it is sufficient to establish this element of the prima facie case.

There is evidence that Bader treated Gilliam differently than white nurses with respect to her work hours. As discussed above, Bader admonished Gilliam on numerous occasions because she was late for work due to her child's school schedule. However, there is evidence that Bader allowed a white nurse, Susan Bretz, to alter her work schedule to arrive at 8:00 a.m. in violation of the policy established by Eberlin in September of 1998. Further, Bader allowed her this concession "so that [she] could get [her] youngest child off to school." (Bretz Dep., p. 9). There is also evidence that Bader yelled at Gilliam, treated her rudely, entered her office after hours, and assaulted her. There is no evidence that Bader treated the white nurses in this manner. Additionally, Williene Harrison, the only other African-American nurse under Bader's supervision, testified that Bader also treated her differently than the white nurses. (Harrison Dep., p. 11).

Based on the above, the undersigned concludes that a jury could reasonably find that Bader's actions toward Gilliam were based on her race.

### b. Severe and Pervasive

In considering a plaintiff's claim that she was subjected to a hostile work environment, the Court must consider the totality of the circumstances. Relevant factors "may include the frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993). "To be actionable, the conduct must create an objectively hostile or abusive work environment, and the victim must also perceive the environment to be abusive." Spriggs v. Diamond Auto Glass at 184.

Viewing the totality of the circumstances in the light most favorable to Gilliam, Bader subjected her to a hostile work environment. Bader supervised Gilliam for four years. Gilliam testified that Bader's hostility was continuous. (Pl. Dep., 77). The record certainly shows that Bader reprimanded Gilliam on numerous occasions during the four years he supervised her. There is also evidence that Bader's conduct was physically threatening and humiliating. Bader yelled at her in front of co-workers on several occasions including January 19, 2001, after which Gilliam wrote to Bader indicating that she felt threatened and humiliated by his actions. (Pl. Dep., Ex. 27). Most notable is the assault that occurred on January 26, 2001. Apparently, after that day, another confrontation took place between Gilliam and Bader in which he came to her office. Gilliam called out to other employees to come to her office because she felt threatened (Bretz Dep., 10; Reeves Dep., 9). Last, Bader's conduct interfered with Gilliam's work. According to Gilliam, Bader's actions caused her to suffer a "breakdown" in May of 2001. Gilliam reported to the psychological counselor that she was unable to deal with stresses on the job and that she had been harassed by her supervisor for the last four years. (Pl. Dep., Ex. 5). After Gilliam returned to work, she began to lock her door out of fear of Bader (Bretz Dep., p. 11; Reeves Dep., p. 14). She was on medication. According to a co-worker, Gilliam "was very nervous. She shook a lot" and "couldn't work because she couldn't concentrate." (Bretz Dep. p. 14). Gilliam had a second breakdown in August of 2001 and was again hospitalized (Pl. Dep., 109). She continues under a doctor's care (Pl. Dep. 7) and has been found disabled by both the state retirement system and the Social Security Administration (Pl. Dep. 15-16).

## **Conclusion**

Based on a review of the record, it is recommended that defendant's motion for summary judgment be denied as to plaintiff's racially hostile work environment claim and granted in all other respects.

                                                  Respectfully submitted,

                                                  s/Joseph R. McCrorey
                                                  United States Magistrate Judge

May 6, 2005
Columbia, South Carolina